SLIP OP. 03-135

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: RICHARD K. EATON, JUDGE

_____
                                          :
SHANDONG HUARONG GENERAL GROUP            :
CORPORATION AND LIAONING MACHINERY        :
IMPORT & EXPORT CORPORATION,              :
                                          :
                      PLAINTIFFS,         :
                                          :
        V.                                :       COURT NO. 01-00858
                                          :       PUBLIC VERSION
UNITED STATES,                            :
                                          :
                      DEFENDANT.          :
_____:


[Antidumping determination remanded.]


                                          Decided: October 22, 2003


        *Hume & Associates, PC* (*Robert T. Hume*), for Plaintiffs.

        *Peter D. Keisler*, Assistant Attorney General, Civil Division, United States Department of
Justice; *David M. Cohen*, Director, Civil Division, Commercial Litigation Branch; *Patricia M.
McCarthy*, Assistant Director, International Trade Section, Civil Division, Commercial
Litigation Branch (*Paul D. Kovac*); *Linda S. Chang*, Office of the Chief Counsel for Import
Administration, United States Department of Commerce, of counsel, for Defendant.


                                OPINION AND ORDER

*EATON*, *Judge*: This matter is before the court on the motion of plaintiffs Shandong Huarong

General Group Corporation ("Huarong") and Liaoning Machinery Import and Export

Corporation ("LMC") (collectively the "Companies") for judgment upon the agency record

pursuant to USCIT R. 56.2.  By their motion, the Companies contest certain aspects of the United

States Department of Commerce's ("Commerce" or the "Department") ninth administrative

review of heavy forged hand tools ("HFHTs") from the People's Republic of China ("PRC"), *see* Heavy Forged Hand Tools From the P.R.C., 66 Fed. Reg. 48,026 (ITA Sept. 17, 2001) (final det.) ("Final Results"), covering the period of review ("POR") February 1, 1999, through January 31, 2000. *Id*. at 48,026. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I) (2000). For the reasons set forth below the court remands this matter for further action in conformity with this opinion.

BACKGROUND

On February 14, 2000, Commerce published a notice of opportunity to request administrative reviews of the antidumping order covering HFHTs from the PRC. *See* Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation, 65 Fed. Reg. 7348, 7349 (ITA Feb. 14, 2000) (opportunity request admin. rev.). In response, several PRC entities—including the Companies—requested administrative reviews. *See* HFHTs, Finished or Unfinished, With or Without Handles, From the P.R.C., 65 Fed. Reg. 66,691, 66,692 (ITA Nov. 7, 2000) (prelim. results and prelim. partial rescission of antidumping duty admin. revs.) ("Preliminary Results"). Specifically, Huarong "requested that the Department conduct an administrative review of its exports of HFHTs within the bars/wedges class or kind of merchandise," and LMC "requested that the Department conduct an administrative review of its exports of HFHTs within the bars/wedges class or kind of merchandise . . . ." *Id*. at 66,692.[1]

_____

[1]      During the POR Huarong also had sales of axes/adzes to the United States. *See* Prelim. Results, 66 Fed. Reg. at 66,692; Pls.' Conf. Mem. Supp. Mot. J. Agency R. ("Pls.' Mem.") at 5 n.2 ("Huarong reported in its June 12, 2000, questionnaire response that it did not have access to the required information to participate in the review with respect to axes/adzes,

(continued...)

Commerce then commenced its investigation and distributed standard nonmarket economy

("NME")[2] country antidumping questionnaires.

LMC timely filed its initial questionnaire response. *See* LMC Sections A & C

Questionnaire Resp., Pub. R. Doc. 22, Conf. R. Doc. 2.[3] In doing so, LMC provided sales data

and information about its sales process. As to sales, LMC claimed that it sold all of its

bars/wedges to a single United States customer ("the Buyer"). *See* Conf. R. Doc. 2, Ex. 1 (sales

quantity); *id*., Ex. 14 (customer identity).[4] As to its sales process, LMC stated the following:

"Customers provide purchase orders and LMC confirms these orders," Pub. R. Doc. 22 at A-10;

it "[did] not use resellers," *id*. at A-11; all of its sales "are based on purchase orders," *id*.; "no

affiliate was involved in the sale of the subject merchandise to the U.S. during the POR," *id*.; and

---

[1](...continued)
and in its September 18, 2000, [response] that its supplier factory refused to respond. In the Preliminary Results, Commerce found that Huarong's supplier failed to act to the best of its ability in responding to the questionnaires with respect to axes/adzes, and therefore assigned adverse facts available."). Because the Companies do not take issue with Commerce's determination as to these sales, the court does not address Commerce's determination in this respect.

[2]        A "nonmarket economy" country is defined as "any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(a). "Any determination that a foreign country is a nonmarket economy country shall remain in effect until revoked by the administering authority." 19 U.S.C. § 1677(18)(c)(i).

[3]        In this response, LMC requested a company-specific antidumping duty margin and provided evidence of its independence from government control. *See* Pub. R. Doc. 22 at A-2.

[4]        LMC identified the Buyer as [[                                        ]]. *See* Conf. R. Doc. 2, Ex. 14.

although its PRC supplier[5] ("the Supplier") of the subject merchandise "knew the ultimate

destination [of the subject merchandise] because it arranged the shipments," *id*. at A-15, "[t]here

was no understanding restricting, discouraging, or prohibiting sales in the home market or

elsewhere. The supplier does not have the right to review LMC's sales records and the supplier

does not provide after-sales service in the United States, participate in U.S. sales calls or

activities . . . ." *Id*.[6] In support of these statements, LMC supplied representative samples of

invoices, packing lists, and other documentation. *See, e.g.*, *id*., Ex. 6.


Commerce then directed LMC to complete Section D, the "Factors of Production

Questionnaire," and to provide data about the factors of production for the subject merchandise

LMC sold. *See* LMC Section D Questionnaire Resp., Pub. R. Doc. 29, Conf. R. Doc. 8. In its

response, LMC stated that it "is a trading company and did not produce any subject

merchandise." Pub. R. Doc. 29 at D-2. LMC further stated that "information relating to [the

manufacturer of the subject merchandise] is on the record in this proceeding and is not being

reproduced." *Id*. at D-2–D-3. LMC further stated that its Supplier of the subject merchandise

"produced [all of the bars] shipped by LMC to the US market and entered during the POR." *Id*.

at D-3.[7]

---

[5]     LMC's supplier of the subject merchandise was [[                    ]].

[6]     In other words, it was clear from LMC's questionnaire responses that it was
acknowledging itself to be the seller of this subject merchandise.

[7]     The Supplier supplied LMC with [[                    ]] of the subject
merchandise that LMC claimed as sales to the Buyer. *See* Conf. R. Doc. 2, Ex. 12 (stating LMC
sold a total of [[          ]] pieces of subject merchandise); *id*. at D-3 (stating [[

(continued...)

After reviewing LMC's Sections A, C, and D responses, Commerce asked LMC to provide additional information, which LMC did in a timely fashion. *See, e.g.*, LMC Supp. Questionnaire Resps. of: Aug. 23, 2000, Pub. R. Doc. 40, Conf. R. Doc. 12; Sept. 18, 2000, Pub. R. Doc. 57, Conf. R. Doc. 20; Sept. 29, 2000, Pub. R. Doc. 70, Conf. R. Doc. 32; Feb. 26, 2001, Pub. R. Doc. 88, Conf. R. Doc. 45; Apr. 9, 2001, Pub. R. Doc. 96, Conf. R. Doc. 52; May 11, 2001, Pub. R. Doc. 108, Conf. R. Doc. 62; and May 30, 2001, Pub. R. Doc. 116, Conf. R. Doc. 69. In general, these supplemental questionnaires focused on information relating to the various factors of production used in the manufacture of the subject merchandise. In addition to this material, in the questionnaire response submitted on September 18, 2000, LMC indicated that it had reported all of its U.S. sales. *See* Pub. R. Doc. 57 at 3 (Q: "Please confirm that you have reported all sales to the United States entered during the period of review ('POR')." A: "LMC confirms that it has reported all sales of the subject merchandise that were exported by LMC and entered U.S. customs during the POR.").

For its part, Huarong also timely filed its initial questionnaire response. *See* Huarong Sections A & C Questionnaire Resp., Pub. R. Doc. 23, Conf. R. Doc. 3.[8] As with LMC, Huarong provided sales data and information dealing with its sales process. *See* Pub. R. Doc. 23. Huarong was instructed to "state the total quantity and value of merchandise under review that you sold during the period of review ('POR') in the United States" and to "[e]xclude your U.S.

---

[7](...continued)
  ]] shipped by LMC to the US market during the POR.").

[8]      In its questionnaire response, Huarong requested a company-specific antidumping duty margin and provided evidence of its independence from government control.

sales to affiliated resellers. Report instead the resales to the first unaffiliated customer." Pub. R. Doc. 23 at A-1. In response, Huarong stated that it "had no affiliated resellers" and submitted data as to its claimed U.S. sales. *See id.*; *id.*, Ex. 1 (quantity and value of sales).[9] As to its sales process, Huarong was instructed to provide information about how it structured certain sales to the United States. *See* Pub. R. Doc. 28 at A-10–A-12. In response, Huarong stated that "[f]or sales made through resellers during the POR, Huarong arranged the sale for export. Huarong does not restrict any reseller's volume or geographic area for distribution. Huarong neither provides customer lists to resellers nor makes joint sales calls with resellers." Pub. R. Doc. 28 at A-11. *See id.* at A-18; *id.*, Ex. 5 (contract). Included with Huarong's questionnaire response was a copy of what it identified in its questionnaire response as a "sales contract" between it and what it identified as a "reseller" (the "Export Agent").[10] Finally, the questionnaire stated that "[i]f you are aware that any of the merchandise that you sold to another company in your country was ultimately shipped to the United States, or was at the time [of] the sale intended to be shipped to the United States, please contact the official in charge within two weeks of receipt of this questionnaire." Pub. R. Doc. 23 at A-16. In response, Huarong stated that it "sold some subject merchandise" through the Export Agent.[11] Conf. R. Doc. 3 at A-16.

---

[9]  As to theses sales, Huarong claimed that it sold [[        ]] of subject merchandise to several United States customers including [[                    ]]. *See* Conf. R. Doc. 3, Ex. 1 (total quantity and value of sales); Ex. 10 (breaking out sales by customer code); Ex. 12 (identifying customer codes).

[10]  The Export Agent was [[                    ]]. *See* Conf. R. Doc. 3, Ex. 5.

[11]  Huarong also stated that [[                    ]]. Conf. R. Doc. 3 at A-16.

Commerce then directed Huarong to submit a response to Section D of the questionnaire. *See* Huarong Section D Questionnaire Resp., Pub. R. Doc. 28, Conf. R. Doc. 7. Section D requested information concerning the various factors of production used to manufacture the subject merchandise. In response, Huarong stated that it was not providing actual data for the factors of production but, rather, data based on "caps." *See* Pub. R. Doc. 28 at D-6. Huarong further stated that it was providing data based on "caps" for the factors of production of steel billet, paint, labor, electricity, and coal. *See* Pub. R. Doc. 28 at D-6–D13.

Thereafter, in order to clarify certain information, Commerce asked Huarong to submit answers to several supplemental questionnaires. *See, e.g.*, Huarong Supp. Questionnaire Resps. of: Sept. 18, 2000, Pub. R. Doc. 59, Conf. R. Doc. 22; Sept. 29, 2000, Pub. R. Doc. 68, Conf. R. Doc. 30; Apr. 9, 2001, Pub. R. Doc. 102, Conf. R. Doc. 50; and May 30, 2001, Pub. R. Doc. 117, Conf. R. Doc. 70. As with LMC's supplemental questionnaire responses, most of the information solicited by Commerce dealt with various factors of production. However, in the questionnaire response submitted on September 18, 2000, Huarong also stated that it had reported all of its U.S. sales. *See* Pub. R. Doc. 59 at 5 (Q: "Please confirm that you have reported all sales to the United States entered during the period of review ('POR')." A: "Huarong confirms that it has reported all sales of the subject merchandise that were exported by Huarong and entered Customs during the POR.").

Commerce then published the Preliminary Results. Based on information provided by the Companies in their original and supplemental questionnaire responses, Commerce determined

that they were each preliminarily entitled to company-specific antidumping duty margins separate

from the PRC-wide antidumping duty margin. *See* Prelim. Results, 65 Fed. Reg. at 66,693.

Commerce calculated Huarong's preliminary company-specific antidumping duty margin for

bars/wedges to be 0.44 percent, and calculated LMC's preliminary company-specific

antidumping duty margin for bars/wedges to be 0.01 percent. *Id*. at 66,696. The PRC-wide

antidumping duty margin for bars/wedges was preliminarily calculated to be 139.31 percent. *Id*.

Commerce then notified the Companies that it would conduct verification of their

submitted sales and factors of production information. *See* Letter from Commerce to law firm of

Hume & Assoc. of 4/9/01, Pub. R. Doc. 100 ("LMC Sales Agenda"); Letter from Commerce to

law firm of Hume & Assoc. of 4/9/01, Pub. R. Doc. 98 ("Huarong Sales Agenda"). Included

with this notification was an outline of the information Commerce intended to review at

verification. *See generally* LMC Sales Agenda; Huarong Sales Agenda.

Commerce conducted verification of LMC's questionnaire responses from April 23

through April 26, 2001. *See* Verification in Dalian, Liaoning, the P.R.C, of the Questionnaire

Resps. of LMC in the Antidumping Duty Admin. Rev. of HFHTs from the P.R.C., Conf. R. Doc.

73 ("LMC Verification Report"). In its verification report, Commerce noted that [[

]]. *Id*. Commerce also made the following "significant findings": (1) "[u]pon arrival at

verification [the Department] observed that LMC had prepared none of the documentation

requested in the [verification] outline"; and (2) that the "overwhelming majority of sales

activities of subject merchandise sales reported by LMC were actually performed by [[

                                                    ]]." *Id*. In other words, it was only at verification,

and not before, that Commerce learned the actual nature of these transactions.


        At sales verification, Commerce found that LMC was not the "seller" of the bars/wedges

but, rather, that "[f]or bar sales LMC's role is largely one of processing documents for shipment

and processing receipt of payment." LMC Verification Report at 5. After reviewing LMC's

records, Commerce found that

> LMC used U.S. importer records to prepare its sales listings to the
> Department and thus did not have the database used as the source
> of its response. However, it did have sales invoices for each sale
> of subject merchandise reported to the Department and these
> reconciled closely to the amounts reported to the Department.

*Id*. at 7.


        Commerce then conducted verification of Huarong's questionnaire responses from May 2

through May 9. *See* Verification in Dongping Town, Shandong Province, the P.R.C., of the

Questionnaire Resps. of Shandong Huarong Gen. Group Corp. in the Admin. Rev. of HFHTs

from the PRC, Conf. R. Doc. 74 ("Huarong Verification Report"). Again, as with LMC,

Commerce made certain "significant findings," including that "[t]he overwhelming majority of

sales activities for subject merchandise sales reported by [[

]]."[12]  *Id*. at 1.  Indeed, Commerce

---

[12]      At verification, Commerce learned from Huarong officials the nature of Huarong's actual sales process for bars/wedges to the Buyer through the Export Agent. Commerce found that

> for [these sales] [the Buyer] contacts Huarong directly through a
> purchase order.  While this purchase order has [the Export Agent]
> named as the recipient, both [the Export Agent] and Huarong
> stated that Huarong is the only recipient of the purchase order.  The
> prices for these sales to [the Buyer] are based on a price agreement
> between Huarong and [the Buyer].  Upon receipt of the order,
> Huarong will directly send an order confirmation to [the Buyer].  If
> [the Buyer] desires any changes in its order, be it quantity, price,
> terms of sale or shipment instructions, it will contact Huarong
> directly.  Upon sending an order confirmation to [the Buyer],
> Huarong sends production orders to its factory.  Upon completion
> of production, Huarong arranges shipment of the product to the
> port.  Huarong and not [the Export Agent] enter[s] the sale in its
> accounts receivable ledger.  Neither Huarong nor [the Export
> Agent] directly arrange [sic] international ocean freight, but rather
> a shipping forwarder arranges ocean shipment.  However, Huarong
> and not [the Export Agent] pays for any ocean freight and
> insurance to the freight forwarder.  It is at this point of shipment
> from Huarong to the freight forwarder that Huarong first notifies
> [the Export Agent] of the sale.  Prior to this point [the Export
> Agent] has no knowledge of the sale.  [The Export Agent] is made
> aware of the sale at this time as Huarong sends [the Export Agent]
> a preliminary packing list on which [the Export Agent] creates an
> official packing list.  Huarong stated that [the Export Agent]'s
> name should be on the packing list as it receives payment from [the
> Buyer], rather than Huarong. . . .  Upon receipt of payment from
> [the Buyer], [the Export Agent] retains a . . . fee and sends
> Huarong the remaining amount.  Huarong records the entire
> amount of the invoice in its accounts receivable and sales ledger
> and records the agent fee provided to [the Export Agent] in its
> agent fee expense ledger.
>
> Huarong and not [the Export Agent] record [sic] [the Buyer's]
> sales in their [sic] sales ledgers, accounts receivable and inventory
> records.

(continued...)

determined that the [[                                          ]] were actually Huarong's. *See* Application of

Adverse Facts Available to Shandong Huarong General Group Corp., Conf. R. Doc. 84 at 3

("[T]he information reviewed at verification clearly demonstrates that Huarong records these

sales in its books and records [them] as sales to the U.S. customer in question."). Finally,

Commerce determined that once the sales [[

]], there were no significant discrepancies in total sales quantity and value of

reconciliation data, or sales completeness, based on Huarong's sales database. *See id.* at 7–9.

Commerce also discussed with Huarong officials the various factors of production for the

subject merchandise and its use of "caps." Commerce stated that

> [a]ccording to company officials, the consumption amounts
> reported for the factors of production were based on what company
> officials call "caps," which are the company's closest
> approximation of the inputs used based on years of production
> experience manufacturing the subject merchandise. Company
> officials stated that they no longer had the worksheets showing
> how they computed the "caps"; however, . . . the company
> supported their reported "caps" with actual production and work
> records from the POR.

Huarong Verification Report at 10–11. Although Commerce stated Huarong was unable to

supply the worksheets it used to calculate all of the "caps," some data was available for the

inputs of electricity, paint, and coal. Using these data as its starting point, Commerce tested the

reasonableness of each reported "cap" for these factors of production. For the factor of

production "paint," Commerce stated that "[t]he average consumption rates based on the

_____

[12](...continued)
Huarong Verification Report at 6 (internal citations omitted).

worksheets were significantly different and much greater than the amounts reported to the

Department." *Id*. at 13. For the factor of production "electricity," Commerce stated that the

"consumption rates based on company records all exceeded the consumption rates reported by

Huarong to the Department." *Id*. at 15. For the factor of production "coal," Commerce stated

that the "consumption rates based on company records all exceeded the consumption rates

reported by Huarong to the Department." *Id*. Finally, Commerce stated that it was unable to

"reconcile certain factors of production to company cost records . . . due to time constraints . . . ."

*Id*. at 16.


       After review and analysis of the questionnaire responses and the information gathered at

verification, Commerce determined that the use of facts available and adverse facts available was

warranted to determine the antidumping duty margins for both LMC and Huarong. *See* Final

Results, 66 Fed. Reg. at 48,028; *see also* Issues and Decision Mem. for the Admin. Revs. of

HFHTs from the P.R.C. — February 1, 1999 through January 31, 2000, Pub. R. Doc. 144

("Decision Memo"). As to LMC, Commerce explained:

> Pursuant to [19 U.S.C. §§ 1677e(a)(2)(A) and (C)], the Department
> has determined that it is appropriate to apply the facts available for
> purposes of determining the dumping margin for LMC in the
> instant review. Pursuant to [19 U.S.C. § 1677e(a)(2)(A)], we have
> determined that LMC has withheld significant information that was
> requested by the Department such that the Department is unable to
> calculate a dumping margin with respect to this company.
> Pursuant to [19 U.S.C. § 1677e(a)(2)(C)], we further determined
> that LMC has significantly impeded the Department's ability to
> accurately determine a margin of dumping for LMC in the instant
> administrative review. . . .
>
> Pursuant to [19 U.S.C. § 1677m(i)], the Department conducted an

on-site verification of the information submitted by LMC at its
sales headquarters in the PRC.  In analyzing LMC's record
information pursuant to [19 U.S.C. § 1677m(e)], we have
determined significant portions of LMC's reported data could not
be verified in accordance with [19 U.S.C. § 1677m(e)(2)].  Upon
arrival at verification, the Department discovered that LMC had
prepared *none* of the documentation requested in the April 9, 2001
sales verification outline.  Moreover, during verification, it became
evident that LMC could not provide the information necessary to
verify its own submissions.  As a consequence of our findings at
verification, pursuant to [19 U.S.C. § 1677m(e)(4)], we determined
that LMC did not act to the best of its ability in responding to the
Department's requests for information. . . .

For the reasons discussed above, the application of [19 U.S.C. §
1677m(e)] does not overcome [19 U.S.C. § 1677e(a)]'s direction to
use facts otherwise available to determine a margin of dumping for
LMC in this administrative review.  Thus the use of facts available
is warranted for LMC in this case.  Moreover, we determine that,
due to the nature of LMC's verification failures, and the
inadequacy of its cooperation, the integrity of LMC's company
reported data on the whole is compromised.  Therefore, we
determine that LMC has not adequately demonstrated its
entitlement to rates separate from the government entity.  As a
consequence LMC will receive the PRC-wide entity rates.
Moreover, . . . the Department has determined, pursuant to [19
U.S.C. § 1677e(b)], that LMC did not cooperate by acting to the
best of its ability to comply with the Department's requests for
information.

Final Results, 66 Fed. Reg. at 48,028 (emphasis in original).  In support of its determination that

LMC "withheld" information, Commerce explained that

[t]he Department discovered at verification that LMC had reported
U.S. sales of bars in its sales database which were in fact sales by
another PRC company to the United States. . . .  Because these
misreported sales constituted the bulk of LMC's reported U.S.
sales, we have determined that LMC's database is inadequate for
purposes of calculating a dumping margin for this respondent.

Decision Memo at 6–7.  In support of its determination that LMC "significantly impeded" the

investigation, Commerce explained that

> LMC demonstrated at verification that it was fully aware of its lack
> of any meaningful involvement in these sales from the beginning
> of this review. Yet . . . LMC misreported the sales as its own in its
> initial questionnaire response and in the ensuing supplemental
> responses. As a consequence of LMC's failure to accurately
> describe the true nature of these sales in its questionnaire and
> supplemental responses, the Department was unable to determine
> that the sales were misreported until verification. As a direct result
> of LMC misreporting its sales, the Department: 1) issued a
> verification outline to LMC for purposes of reviewing the data
> relevant to these transactions; 2) did not anticipate the need to
> verify these transactions at another company's facilities in the
> PRC; and 3) incorrectly included these sales in the preliminary
> dumping margin analysis for LMC. Thus, LMC's
> mischaracterization of these sales significantly impeded the
> Department's ability to accurately determine a margin of dumping
> for LMC in the instant administrative review.

*Id*. at 10. As to Huarong, Commerce explained:

> Pursuant to [19 U.S.C. §§ 1677e(a)(2)(A) and (C)], the Department
> has determined that it is appropriate to apply the [f]acts available
> for purposes of determining the dumping margin for Huarong in
> the instant review. Specifically, Huarong failed to report the great
> majority of its U.S. market sales to the Department. Thus,
> pursuant to [19 U.S.C. § 1677e(a)(2)(A)], the Department has
> determined that Huarong has withheld information that was
> requested by the Department. . . . In addition, pursuant to [19
> U.S.C. § 1677e(a)(2)(C)], we have determined that Huarong has
> significantly impeded this review.
>
> We further determine that Huarong has failed to satisfy several of
> the requirements enunciated by [19 U.S.C. § 1677m(e)]. Pursuant
> to [19 U.S.C. § 1677m(i)], the Department conducted an on-site
> verification of Huarong's data at Huarong's headquarters in China.
> Upon arrival at verification, the Department found that Huarong
> had prepared almost no documents requested of it in the
> Department's verification outline. As a result of the verification
> team having to devote extensive amounts of time to examining
> issues pertaining to the unreported U.S. sales, and difficulties in
> verifying the accuracy of the reported factors of production input

levels, there was insufficient time for the verifiers to conduct a full
factors of production verification. As a consequence of our
findings at verification, we determined that Huarong did not act to
the best of its ability in responding to the Department's requests for
information pursuant to [19 U.S.C. § 1677m(e)(4)].

For the reasons stated above, the application of [19 U.S.C. §
1677m(e)] does not overcome [19 U.S.C. § 1677e(a)]'s direction to
use facts otherwise available for purposes of determining a
dumping margin for Huarong. Thus, the use of facts available is
warranted for Huarong in this case. Moreover, we determine that,
due to the nature of Huarong's verification failures, and the
inadequacy of its cooperation, the integrity of this company's
reported data on the whole is compromised. Therefore, we
determine that Huarong has not adequately demonstrated its
entitlement to rates separate from the government entity. As a
consequence Huarong will receive the PRC-wide entity rates.

Final Results, 66 Fed. Reg. at 48,028. In support of its determination that Huarong "withheld"

information in its questionnaire responses, Commerce explained that

the Department has determined that Huarong failed to report the
great majority of its U.S. sales. Thus, Huarong has withheld
information that was requested by the Department. By not
including these sales in its U.S. sales database and misidentifying
these transactions as sales to another Chinese company, for resale
to the United States, Huarong failed to disclose the fact that it: 1)
negotiated the sales prices and terms with the U.S. customer; 2)
received the purchase order directly from the U.S. customer; 3)
issued the order confirmation directly to the U.S. customer; 4)
incurred brokerage and handling and marine insurance expenses
for the transactions in question; and 5) never transferred ownership
of these unreported sales to the named PRC reseller.

Decision Memo at 4. In support of its determination that Huarong "significantly impeded" the

investigation, Commerce explained that

[a]s a direct consequence of Huarong's mischaracterization of, and
failure to report, the majority of its sales to the United States, the
Department[:] 1) did not solicit further information from Huarong
regarding these transactions in its supplemental questionnaires; 2)

did not anticipate the need to address these sales at Huarong's verification and thus scheduled Huarong's verification without regard to these transactions; and 3) did not include these sales in the preliminary dumping margin analysis for Huarong. Thus, Huarong's mischaracterization of these sales significantly impeded the Department's ability to accurately determine a margin of dumping for Huarong in the instant administrative review. With respect to the verification, we note that Huarong's failure to report these sales in its database and its mischaracterization of them as sales to a PRC reseller resulted in the Department having to spend an inordinate amount of the scheduled verification at Huarong on sales issues, thus reducing the amount of time left and impeding the progress of the factors of production portion of the verification . . . . This, compounded by the failure of Huarong to adequately prepare for verification, led to the Department's inability to reconcile factors of production to the company's cost records.

*Id.* at 6.

Commerce then determined that the use of adverse facts available was warranted as the Companies did not cooperate by acting to the best of their abilities to comply with the Department's requests for information. *See* Final Results, 66 Fed. Reg. at 48,028 ("[A]s discussed in detail in the Decision Memorandum and the Huarong AFA Memorandum, pursuant to [19 U.S.C. § 1677e(b)], we have determined that Huarong did not cooperate by acting to the best of its ability to comply with the Department's requests for information."); *id.* ("[A]s discussed in detail in the Decision Memorandum and the LMC AFA Memorandum, the Department has determined, pursuant to [19 U.S.C. § 1677e(b)], that LMC did not cooperate by acting to the best of its ability to comply with the Department's requests for information."). In the Decision Memo, Commerce summarized its adverse facts available reasoning:

Section [1677e(b) of Title 19] states that if the administering

authority . . . finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority . . . , the administering authority . . . , in reaching the applicable determination under this title, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available. Adverse inferences are appropriate "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully" . . . . Such adverse inference may include reliance on information derived from[:] (1) the petition; (2) a final determination in the investigation under this title; (3) any previous review . . . [;] or (4) any other information on the record.

To examine whether the respondent "cooperated" by "acting to the best of its ability" under [19 U.S.C. § 1677e(b)], the Department considers, *inter alia*, the accuracy and completeness of submitted information and whether the respondent has hindered the calculation of accurate dumping margins.

\*   \*   \*   \*   \*

[A]s discussed . . . the accuracy of Huarong's and LMC's responses could not be substantiated at verification and the Department determined that it is appropriate to use the facts available for these two respondents. Neither Huarong or LMC cooperated by acting to the best of their respective abilities to comply with the Department's requests for information. Huarong failed to report a substantial portion of its U.S. sales, despite its knowledge that these were U.S. sales subject to this review. In addition, at verification, Huarong was unable to substantiate numerous reported factor of production values. LMC misreported, as the predominant portion of its U.S. sales database, transactions for which it was not the seller . . . and at verification could not substantiate the reported data with respect to these sales.

Decision Memo at 11–12, 13 (citations omitted). As a result of these findings, the Companies'

subject merchandise was assigned the PRC-wide antidumping duty margin of 47.88 percent. *See*

*Final Results*, 66 Fed. Reg. at 48,029 n.1 ("Based on the results of this review the following

companies are no longer eligible for separate rates . . . Huarong, and LMC.").

The Companies then commenced this action arguing that Commerce's determination was improper. Specifically, the Companies contend that Commerce's determination to apply the PRC-wide antidumping duty margin to their subject merchandise is not supported by substantial evidence or otherwise in accordance with law.

STANDARD OF REVIEW

The court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i); *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i) (2000)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Huaiyin,* 322 F.3d at 1374 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Id*. (citing *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). "In reviewing the Department's construction of a statute it administers, [the court defers] to the agency's reasonable interpretation of the antidumping statutes if not contrary to an unambiguous legislative intent as expressed in the words of the statute." *Id*. at 1374–75 (citing *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881–82 (Fed. Cir. 1998)). Furthermore, "[a]s long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's

investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), *aff'd* 810 F.2d 1137 (Fed. Cir. 1987) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984); *Abbott v. Donovan*, 6 CIT 92, 97, 570 F. Supp. 41, 46–47 (1983)).

DISCUSSION

I.  *Commerce's use of facts available and adverse facts available for LMC's sales data and Huarong's sales and factors of production data*

A.  *Facts available*

It is Commerce's duty to implement "the basic purpose of the [antidumping] statute—determining current margins as accurately as possible," *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990), and it is Commerce's "responsibility to prevent circumvention of the antidumping law." *Queen's Flowers de Colom. v. United States*, 21 CIT 968, 972, 981 F. Supp. 617, 622 (1997) (citing *Mitsubishi Elec. Corp. v. United States*, 12 CIT 1025, 1046, 700 F. Supp. 538, 555 (1988)). In order that Commerce may comply with these mandates, interested parties that choose to participate in an investigation must cooperate by complying with Commerce's requests for information. *Reiner Brach GmbH & Co. KG v. United States*, 26 CIT __, __, 206 F. Supp. 2d 1323, 1333 (2002) (citing *Sanyo Elec. Co. v. United States*, 22 CIT 304, 314, 9 F. Supp. 2d 688, 697 (1998); *RHP Bearings v. United States*, 19 CIT 133, 136, 875 F. Supp. 854, 857 (1995)) ("It is the interested party's obligation to create an accurate record and provide Commerce with the information requested to ensure an accurate

dumping margin.").[13]    Nonetheless, Commerce "shall not decline to consider information that is

submitted by an interested party and is necessary to the determination but does not meet all the

applicable requirements," if it meets five statutory criteria.  *See* 19 U.S.C. § 1677m(e)[14]; *Borden*,

---

[13]        By statute, where an interested party attempts to comply with Commerce's requests for information but Commerce finds such information is deficient, Commerce must provide the interested party with an opportunity to remedy the deficiencies.  *See* 19 U.S.C. § 1677m(d); *NTN Bearing Corp. of Am. v. United States*, 26 CIT __, __, 104 F. Supp. 2d 110, 141 (2000) (quoting *Borden, Inc. v. United States*, 22 CIT 233, 262, 4 F. Supp. 2d 1221, 1245 (1998), *aff'd sub nom. F.lli De Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000), *aff'd in part and rev'd in part on other grounds by Micron Tech., Inc. v. United States*, 243 F.3d 1301 (Fed. Cir. 2001)) ("Section 1677m, which was enacted as part of the URAA, is 'designed to prevent the unrestrained use of facts available as to a firm which makes its best effort to cooperate with [Commerce].'").  Here, no party argues that the provisions of subsection 1677m(d) apply to the instant action.

[14]        Subsection 1677m(e) of title 19 provides:

> In reaching a determination under [19 U.S.C. § 1675] the administering authority . . . shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority . . . if—
>
>> (1) the information is submitted by the deadline established for its submission,
>>
>> (2) the information can be verified,
>>
>> (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
>>
>> (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority . . . with respect to the information, and
>>
>> (5) the information can be used without undue

(continued...)

22 CIT at __, 4 F. Supp. 2d at 1246 ("[U]nder subsection (e), even if the initial information submitted is 'deficient', and even if, after an opportunity to 'remedy or explain,' the Department finds the information 'not satisfactory,' it *still* must use the information, rather than facts available, so long as the criteria of subsection (e) have been met." (emphasis in original)); *see also NTN Bearing*, 26 CIT at __, 104 F. Supp. 2d at 141 (citing *Borden*, 22 CIT at __, 4 F. Supp. 2d at 1245); *Steel Auth. of India v. United States*, 25 CIT __, __, 149 F. Supp. 2d 921, 927 (2001); *Branco Peres Citrus, S.A. v. United States*, 25 CIT __, __ n.7, slip op. 01-121 at 22 n.7 (citing Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-826(I), at 865 (1994), *reprinted in* 1994 U.S.C.C.A.N 4040, 4195; *Borden*, 22 CIT at __, 4 F. Supp. 2d at 1245–46) ("[S]ection 1677m(e) is, on its face, inapplicable in situations where . . . a party has failed to 'demonstrate[] that it acted to the best of its ability in providing the information and meeting the requirements established by [Commerce] with respect to the information.'"). Finally, if, after soliciting information from interested parties and allowing them an opportunity to remedy any deficiencies in such submissions, needed information is not on the record, Commerce may then use facts available in order to complete its investigation. *See* 19 U.S.C. § 1677e(a).[15]  As recently stated by the Court of Appeals for the

---

[14](...continued)
                            difficulties.

19 U.S.C. § 1677m(e).  It is apparent from the inclusion of requirement (2) alone that this provision is intended for use prior to verification.

[15]          Pursuant to 19 U.S.C. § 1677e:

          If—

                                                                                        (continued...)

Federal Circuit: "Under subsection (a), if a respondent 'fails to provide [requested] information *by the deadlines for submission*,' Commerce shall fill in the gaps with 'facts otherwise available.'" *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) ("*Nippon Fed. Cir.*") (emphasis added).

In the instant investigation, Commerce determined that the use of facts available was warranted for LMC's sales data, and for Huarong's sales and factors of production data. As to the Companies' sales data Commerce determined that the use of facts available was warranted because they each failed to properly provide this requested information in either their initial or supplemental questionnaire responses. In support, Commerce determined that the Companies had "mischaracterized" certain sales data in their responses and, therefore, pursuant to 19 U.S.C. § 1677e(a), the Companies "withheld" information and "significantly impeded" the investigation. Furthermore, Commerce determined that the use of facts available was warranted as to

---

[15](...continued)
        (1) necessary information is not available on the record, or

        (2) an interested party or any other person—

                (A) withholds information that has been requested
                by the administering authority . . . under this
                subtitle, . . . [or]

                (C) significantly impedes a proceeding under this
                subtitle, . . .

        the administering authority . . . shall, subject to [19 U.S.C. §
        1677m(d)], use the facts otherwise available in reaching the
        applicable determination under this subtitle.

19 U.S.C. § 1677e(a).

Huarong's factors of production data because Commerce was unable to completely verify that information.

The Companies argue that Commerce's determination that the use of facts available was warranted as to their sales, and as to Huarong's factors of production data, was improper. The Companies contend that

> [t]he Department's decision . . . was based primarily upon its assertion that Plaintiffs withheld information that was requested by the Department. The information they purportedly withheld was that [[
>
> ]]. Commerce decided that Plaintiffs failed to act to the best of their ability based on what occurred during their verifications. Commerce further found that Plaintiffs impeded the investigation, again because Plaintiffs reported that certain bars/wedges sales were made by [[                                        ]].

Pls.' Mem. at 9–10 (citations omitted). The Companies contend that "the record demonstrates that Plaintiffs cooperated with the Department throughout the proceeding by answering all of Commerce's questionnaires and cooperating fully during the verification." *Id*. at 10. The Companies further argue that "regardless of who is deemed the seller, the Department had all the data it needed from Plaintiffs to calculate accurate dumping margins for both of them." *Id*.

> 1. *The Companies did not provide requested information in their questionnaire responses*

The court first examines whether the Companies, by their questionnaire responses, "create[d] an accurate record and provide[d] Commerce with the information requested to ensure an accurate dumping margin." *Reiner Brach*, 26 CIT at __, 206 F. Supp. at 1333. In other

words, the court must determine whether the Companies had, prior to verification, completely

and accurately complied with Commerce's requests for information. The court examines each

company in turn.

a.      *LMC*

The record shows that Commerce solicited information about LMC's sales data and sales

process. In response to questions about its sales process, LMC stated that

> [t]he supplier knew the ultimate destination [of the subject
> merchandise] because it arranged the shipments. There was no
> understanding restricting, discouraging, or prohibiting sales in the
> home market or elsewhere. The supplier does not have the right to
> review LMC's sales records and the supplier does not provide
> after-sales service in the United States, participate in U.S. sales
> calls or activities, or provide sales incentives to LMC's customers.

LMC Section A Questionnaire Resp., Pub. R. Doc. 22 at A-15. This explication of LMC's sales

process is accurate as far as it goes, but it is not fully responsive to the question asked. For

instance, the statement "the supplier knew the ultimate destination [of the subject merchandise]

because it arranged the shipments" fails to mention that the Supplier arranged all the terms of the

sale, including pricing, and that the Supplier ultimately received payment for the subject

merchandise. The statement "[t]here was no understanding restricting, discouraging, or

prohibiting sales in the home market or elsewhere" is misleading in that, while there is no

evidence that the Supplier could generally control LMC's sales process, LMC had absolutely no

control over the transactions here at issue. The statement "[t]he supplier does not have the right

to review LMC's sales records" may, again, be accurate as it relates to LMC's own sales, but for

the transactions here at issue, LMC had no involvement with the sales process and did not, in

fact, have the relevant records of the sales in its own sales database. Finally, the statement that the Supplier "[did] not participate in U.S. sales calls or activities" is simply false as the Supplier completely arranged the sales. In other words, although LMC identified the transactions at issue as its own sales in its questionnaire responses, they were, in fact, not its own sales.

b.      *Huarong*

As to Huarong, the record is clear that it did not accurately provide information in its responses in several important respects. First, Huarong claimed that certain transactions were not "sales" to the Buyer because it "resold" some merchandise "through" the Export Agent; yet the Export Agent did not pay Huarong for the merchandise, and Huarong neither reported these "sales" to Commerce nor recorded them as sales to the Export Agent on its sales ledgers. Second, Huarong stated that it was uninvolved with the sales process of certain transactions; yet the record shows that not only was the Buyer a pre-existing customer of Huarong's, but the terms of the sales were agreed upon directly by the Buyer and Huarong. In other words, although Huarong did not identify certain transactions as its own sales to the Buyer, they were, in fact, its own sales.

2.      *Commerce's determination that it need not consider data submitted by the Companies at verification to remedy missing information was proper*

The court finds proper Commerce's determination that it need not consider information relating to the Companies' sales data gathered during verification. Specifically, Commerce found that it need not consider this information because, pursuant to 19 U.S.C. § 1677m(e)(4),

the Companies were unable to show that they had acted to the best of their abilities in providing the information prior to verification.

The Companies argue that they were acting to the best of their abilities to comply with Commerce's requests for information because: (1) pursuant to the statute, Commerce's regulations, and the antidumping questionnaire instructions they accurately identified who the "seller" was for the transactions here at issue and, in any event, the identity of the "seller" was inconsequential; (2) even assuming, *arguendo*, that it was relevant as to who the "seller" was in the transactions here at issue, Commerce eventually came into possession of all relevant information and was able to calculate an antidumping duty margin from that information; and (3) they otherwise "cooperated" with Commerce's requests for information. The court does not agree.

Where two entities each apply for company-specific treatment, the actual seller of the subject merchandise is relevant. With respect to the time at which Commerce came into possession of the relevant information, the court finds *Florex v. United States*, 13 CIT 28, 705 F. Supp. 582 (1989), instructive. In *Florex*,

> [t]he questionnaire response was replete with other errors. In such a situation [Commerce] is justified in finding a failure of verification. Such a finding is essentially the same as a finding of failure to respond at all. In fact, it may be worse because [Commerce] had to expend time at verification to discover the errors made in the response.

*Florex,* 13 CIT at 32, 705 F. Supp. at 588; *see Maui Pineapple Co. v. United States*, 25 CIT __,

__, 264 F. Supp. 2d 1244, 1259 (2001) (discussing *Florex,* 13 CIT at 32, 705 F. Supp. at 588). In the instant investigation Commerce was placed in a similar position. Specifically, at verification—and not before—it became evident that the Companies, by their questionnaire responses, did not accurately provide information about their sales and sales processes. As a result, Commerce was compelled to expend a considerable amount of time discovering and correcting these critical errors. Indeed, because of the amount of time spent correcting errors Commerce was unable to complete the Companies' verification within the scheduled dates. Therefore, as the Companies misstated the seller for certain transactions of subject merchandise in their questionnaire responses, they cannot show that they were acting to the best of their abilities to supply requested information in those responses. 19 U.S.C. § 1677e(a)(4).

As to the Companies' argument that Commerce eventually came into possession of all the relevant documentation and should, therefore, have calculated individual margins based on such collected data, it is incumbent upon parties that choose to participate in an antidumping duty investigation to accurately provide information to Commerce in the first instance. *Reiner Brach*, 26 CIT at __, 206 F. Supp. 2d at 1333 ("It is the interested party's obligation to create an accurate record and provide Commerce with the information requested to ensure an accurate dumping margin."). Indeed, verification is not an opportunity to submit new answers to previously posed questions, but is more like an audit of information previously submitted. *See Bomont Indus. v. United States*, 14 CIT at 208, 209, 733 F. Supp. 1507, 1508 (1990) ("[V]erification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness."). Because the Companies did not accurately supply requested information about

their sales and sales processes in their questionnaire responses, presentation of this data to Commerce at verification cannot serve as proof that they "acted to the best of their abilities" to supply this information in their questionnaire responses.

Finally, the record does not support the Companies' argument that they "cooperated" with Commerce's requests for information. Specifically, the Companies make much of their alleged cooperation with Commerce during verification. *See* Pls.' Mem. at 14 ("The record reflects . . . that Plaintiffs fully cooperated during verification . . . ."). However, the Companies misstate Commerce's determination in this regard. The record shows that Commerce found the use of facts available was warranted because the Companies failed to provide requested information and impeded the investigation prior to verification, not that the Companies may or may not have "cooperated" with Commerce at verification. *See* Decision Memo at 7 (stating use of facts available was warranted as to LMC because "[t]he Department's questionnaire specifically asks respondents to '[s]tate the total quantity and value of the merchandise under review that *you* sold during the period of review in the United States . . . .'" (bracketing and emphasis in original)); *id.* at 4 (stating use of facts available was warranted as to Huarong because "[t]he Department's Section A questionnaire specifically asks respondents to provide '[t]he total quantity and value of the merchandise under review that *you sold* during the period of review in the United States . . . .'" (emphasis and second bracketing in original)).[16] Thus, that the Companies may

---

[16] The Companies also take issue with the Government's position that they were not fully forthcoming about the role of the Export Agent in this matter. The Companies state

> [t]he Government asserts that the Plaintiffs appear to have tried to

(continued...)

have cooperated with Commerce at verification cannot be evidence that they acted to the best of

---

[16](...continued)
> take advantage of [[      ]]'s lower rate from a prior review when paying cash deposits during the pendency of the current review, and relies on a statement given by an [[
> ]] during verification that it believed the customer had the bars sold through [[      ]] in order to avoid dumping penalties. This is absurd for several reasons.
>
> First of all, the company official's statement was only conjecture, and no one asked the customer why it had the shipments go through [[      ]]. Second, the official retracted his statement. And third, neither LMC nor Huarong attempted to avoid paying dumping duties. To the contrary, both of them requested reviews of the entries at issue, as the Government admits. If the Plaintiffs sought to avoid paying dumping duties, they certainly would not have requested these reviews, reported all their sales, and showed all their records to Commerce, as they clearly did here. The Government's claim is preposterous.

Pls.' Reply Br. in Resp. Mem. Def. Opp'n Pls.' Mot. J. Agency R. Mem. ("Pls.' Reply") at 15 (footnotes omitted). The record contains evidence of a series of communications between Huarong and the Buyer. *See* [[

]]. These communications, sent on both Huarong's and the Buyer's letterhead, dealt with, among other things, shipments of defective "Gorilla Bars." *See generally id.* By these communications the parties attempted to reach a settlement, and presented various reasons as to why the settlement should be adjusted higher or lower. After discussion, Huarong stated:

> [[
>
>
>
> ]]

*Id.*, [[                                                           ]] (text as in original, emphasis added). In the immediately preceding segment [[
]] while Huarong's was 34.00 percent. *See* HFHTs, Finished or Unfinished, With or Without Handles, From the P.R.C., 63 Fed. Reg. 16,758, 16,767 (ITA Apr. 6, 1998) (final results).

their abilities to supply requested information in their questionnaire responses.

3.      *Commerce's determination that use of facts available was warranted for LMC's missing sales data was proper*

Commerce determined that the use of facts available was warranted for LMC's sales data because LMC did not accurately provide that information in any of its questionnaire responses. In support of its determination, Commerce stated that it was using facts available because, pursuant to 19 U.S.C. §§ 1677e(a)(2) and (a)(4), LMC "withheld" information and "significantly impeded" the investigation. *See* Final Results, 66 Fed. Reg. at 48,028.

a.      *LMC withheld information*

The record shows that LMC did not accurately supply requested information in its questionnaire responses. Specifically, LMC stated in its questionnaire responses that it sold bars/wedges to a U.S. customer. At verification, however, it became evident that LMC was not the actual seller. Indeed, at verification LMC at first continued to maintain that it was the seller but, eventually, admitted it was not. *See* Decision Memo at 9 ("LMC acknowledged that it had not purchased bars for resale to the United States; rather it acted more along the lines of a processing agent for the relevant sales to the U.S. customer."). Thus, because LMC did not accurately provide requested sales information, Commerce's determination that it "withheld" information is sustained.

b.        *LMC significantly impeded the investigation*

As noted above, the record shows that LMC claimed to have certain sales when it had

none and did not accurately describe [[                                                       ]].  Based

on this inaccurate information, Commerce scheduled LMC's verification with the expectation

that LMC was the seller of subject merchandise to a U.S. customer.  At verification Commerce

reasonably expected LMC to be in possession of the relevant original sales documents as to these

transactions.  At verification, however, it became evident that LMC did not possess these

documents, and did not record the relevant sales in its sales database.  Thus, because LMC did

not reveal its role in these sales until verification, and because it did not possess the requisite

sales information, Commerce's determination that LMC "significantly impeded" the

investigation is sustained.


4.        *Commerce's determination that the use of facts available was warranted*
          *for Huarong's missing sales data was proper*

Commerce determined that the use of facts available was warranted for establishing

Huarong's sales data because (1) Huarong did not accurately provide that information in any of

its questionnaire responses, and (2) because Commerce was required to spend nearly all of its

scheduled verification time tracking down sales data, the verifiers were unable to address matters

related to the factors of production data.  In support of its determination, Commerce stated that it

was using facts available because, pursuant to 19 U.S.C. §§ 1677e(a)(2) and (a)(4), Huarong both

"withheld" information and "significantly impeded" the investigation.  *See* Final Results, 66 Fed.

Reg. at 48,028.

a.      *Huarong withheld information*

The record shows that the questionnaires sent to Huarong specifically asked it to supply information about "your" sales to the United States. In its responses, however, Huarong never included information regarding the transactions here at issue even though Commerce specifically requested this information. Thus, since Huarong had the information in its possession and did not provide it, Commerce's determination that it "withheld" information is sustained.

b.      *Huarong significantly impeded the investigation*

Commerce was likewise justified in its determination that the use of facts available was warranted as to Huarong's sales data based on its finding that Huarong "significantly impeded" the investigation. The record shows that Commerce, based on the information provided in Huarong's questionnaire responses, scheduled verification with the expectation that it would only be verifying a small quantity of bar sales and various factors of production. However, because of the inaccuracies in Huarong's submitted sales data, Commerce spent its verification time collecting this missing information. Therefore, because Commerce was unable to complete verification of Huarong's submitted data with respect to factors of production due to Huarong's actions, Commerce's determination that Huarong "significantly impeded" Commerce's investigation is sustained.

5.      *Commerce's determination that the use of facts available was warranted for Huarong's factors of production data was proper*

Commerce was justified in its determination that the use of facts available was warranted

as to Huarong's factors of production data based on its finding that Huarong "significantly

impeded" the investigation. As noted above, the record shows that Commerce scheduled

verification with the expectation that it would only be verifying a small quantity of bar sales and

various factors of production. However, because of the inaccuracies in Huarong's submitted

sales data, Commerce spent its verification time collecting this missing information, and was

thus unable to verify completely Huarong's factors of production data. Final Results, 66 Fed.

Reg. at 48,028 ("As a result of the verification team having to devote extensive amounts of time

to examining issues pertaining to the unreported U.S. sales, and difficulties in verifying the

accuracy of the reported factors of production input levels, there was insufficient time for the

verifiers to conduct a full factors of production verification."). In addition, Commerce's

preliminary review of Huarong's factors of production, based on "caps," found that there were

significant discrepancies between Huarong's questionnaire responses and the data it provided at

verification. *See* Huarong Verification Report at 13 (stating "[t]he average consumption rates

[for paint] based on the worksheets were significantly different and much greater than the

amounts reported to the Department."); *id*. at 15 ("These consumption rates [for electricity] based

on company records all exceeded the consumption rates reported by Huarong to the Department.

We asked company officials to explain the discrepancy and they stated that they had no

explanation."); *id*. ("These consumption rates [for coal] based on company records all exceeded

the consumption rates reported by Huarong to the Department."). Therefore, because Commerce

was unable to complete verification of Huarong's submitted data with respect to factors of

production due to Huarong's actions, Commerce's determination that the use of facts available

was warranted as to Huarong's factors of production data because Huarong "significantly

impeded" Commerce's investigation is sustained.

6.      *Commerce's determination that the use of adverse facts available was warranted for the Companies' sales data, and Huarong's factors of production data was proper*

By statute, Commerce may find the use of adverse facts available is warranted where it first finds that a respondent "has failed to cooperate by not acting to the best of its ability to comply with a request for information . . . ." *See* 19 U.S.C. § 1677e(b)[17]; *Nippon Fed. Cir.*, 337 F.3d at 1381 ("[S]ubsection (b) permits Commerce to 'use an inference that is adverse to the interest of [a respondent] in selecting from among the facts otherwise available,' only if Commerce makes the separate determination that the respondent 'has failed to cooperate by not

---

[17]      Title 19 U.S.C. § 1677e(b) provides:

If [Commerce] . . . finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce] . . . , [Commerce], in reaching the applicable determination under this subtitle, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available. Such adverse inference may include reliance on information derived from—

(1) the petition,

(2) a final determination in the investigation under this subtitle,

(3) any previous review under section 1675 of this title or determination under section 1675b of this title,

(4) any other information placed on the record.

19 U.S.C. § 1677e(b)(1)–(4).

acting to the best of its ability to comply.'" (bracketing in original)).  The Court of Appeals for

the Federal Circuit stated that "[t]he focus of [1677e(b)] is respondent's *failure to cooperate to*

*the best of its ability*, not its failure to provide requested information."  *Nippon Fed. Cir.*, 337

F.3d at 1381 (emphasis in original).  The court further stated that "the statutory mandate that a

respondent act to 'the best of its ability' requires the respondent to do the maximum it is able to

do."  *Id*. at 1382.  The court continued:

> [t]o conclude that an importer has not cooperated to the best of its
> ability and draw an adverse inference under section 1677e(b),
> Commerce need only make two showings.  First, it must make an
> objective showing that a reasonable and responsible importer
> would have known that the requested information was required to
> be kept and maintained under the applicable statutes, rules, and
> regulations.  Second, Commerce must then make a subjective
> showing that the respondent under investigation not only has failed
> to promptly produce requested information, but further that the
> failure to fully respond is the result of the respondent's lack of
> cooperation in either: (a) failing to keep and maintain all required
> records, or (b) failing to put forth its maximum efforts to
> investigate and obtain the requested information from its records.
> An adverse inference may not be drawn merely from a failure to
> respond, but only under circumstances in which it is reasonable for
> Commerce to expect that more forthcoming responses should have
> been made; i.e., under circumstances in which it is reasonable to
> conclude that less than full cooperation has been shown.

*Id*. at 1382–83 (citation omitted).[18]

        Here, the Companies argue that Commerce's determination to use adverse facts available

was improper because they

---

[18]        Although the subject of the Court of Appeals for the Federal Circuit's analysis of
19 U.S.C. § 1677e(b) in *Nippon Fed. Cir.* was a United States importer, there is nothing in its
reasoning that would preclude its analysis from covering a PRC exporter.

> fully cooperated [with Commerce's investigation] and that their responses in nearly all instances reconciled to their books and records. Plaintiffs never sought to mislead Commerce's verifiers but rather offered them upon arrival at Huarong's headquarters corrections to their prior submissions, explained the use of "caps" and otherwise tried to give the verifiers everything they requested. Where this was not possible, the company officials provided the verifiers with all the written records they had available. . . . Accordingly, there is no basis for Commerce's determination . . . for deriving an adverse inference in selecting which facts available to use in calculating their margins.

Pls.' Mem. at 20–21.

The court finds proper Commerce's determination that the use of adverse facts available was warranted as to the Companies' sales data, and as to Huarong's factors of production data, because they each failed to act to the best of their ability to comply with Commerce's requests for information. First, there can be no doubt that reasonable and responsible sellers that request an administrative review of an antidumping order will have accurate records of their sales. Indeed, the administrative record shows that Huarong had such records and eventually produced them. There can also be no doubt that a reasonable and responsible producer, seeking an administrative review, will have accurate records of its factors of production. Second, the record shows that LMC and Huarong did not make the maximum effort to produce the sales records in order to respond to Commerce's questionnaire requests. Rather, the information contained in the questionnaire responses was inaccurate. In addition, it cannot be said that Huarong did the maximum it could do to substantiate its use of "caps," as it did not retain the worksheets upon which the caps were based or make any effort to replicate them. As a result, Commerce has satisfied the statutory showings for the use of adverse facts available as articulated by the Court

of Appeals for the Federal Circuit. *See Nippon Fed. Cir.*, 337 F.3d at 1382. Thus, the court

sustains Commerce's determination that the use of adverse facts available was warranted as to

the Companies' sales data and Huarong's factors of production data.


II.        *Commerce's determination that the Companies should receive the PRC-wide
           antidumping duty margin based on their failure to provide evidence of their
           independence from state control*

Where an antidumping duty investigation involves an NME country, all exporters within

that country are presumed to be subject to government control. *See Sigma Corp. v. United*

*States*, 117 F.3d 1401, 1405–06 (Fed. Cir. 1997) ("[I]t was within Commerce's authority to

employ a presumption of state control for exporters in a nonmarket economy, and to place the

burden on the exporters to demonstrate an absence of central government control. . . . Moreover,

because exporters have the best access to information pertinent to the 'state control' issue,

Commerce is justified in placing on them the burden of showing a lack of state control." (citing

*Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993)); *see also Fujian*

*Mach. & Equip. Imp. & Exp. Corp. v. United States*, 25 CIT __, __, 178 F. Supp. 2d 1305, 1329

(2001) (citing Manganese Metal From the P.R.C., 63 Fed. Reg. 12,440, 12,441 (ITA Mar. 13,

1998) (final results and partial rescission of admin. rev.)). While all NME exporters are

presumed to be subject to government control, an exporter may request and receive an

antidumping duty margin separate from the NME-wide antidumping duty margin by providing

evidence of its independence from government control. *See Transcom, Inc. v. United States*, 294

F.3d 1371, 1373 (Fed. Cir. 2002) (citing *Sigma*, 117 F.3d at 1405–06) ("Under the NME

presumption, a company that fails to demonstrate independence from the NME entity is subject

to the countrywide rate, while a company that demonstrates its independence is entitled to an

individual rate as in a market economy."); *see also* Huarong Section A Questionnaire Resp., Pub.

R. Doc. 23 at A-1 ("The Department presumes that a single weighted-average dumping margin is

appropriate for all exporters in a nonmarket economy country. The Department may, however,

consider requests for separate rates from individual exporters."); LMC Section A Questionnaire

Resp., Pub. R. Doc. 22 at A-1 (same). Where an NME exporter successfully rebuts the NME

presumption by providing evidence of its independence from state control, Commerce may

assign such NME exporter a company-specific antidumping duty margin. However, where an

NME exporter fails to either: (1) rebut the nonmarket economy presumption of state control, or

(2) otherwise cooperate with the investigation[19] by failing to "respond to Commerce's

questionnaire for that review," Commerce may then apply the NME-wide antidumping duty

margin to such exporter's merchandise. *See Sigma*, 117 F.3d at 1411 (citing *D&L Supply Co. v.

United States*, 113 F.3d 1220, 1222 (Fed. Cir. 1997)) (stating Commerce has a "long-standing

practice of assigning to respondents who fail to cooperate with Commerce's investigation the

highest margin calculated for any party in the less-than-fair-value investigation or in any

administrative review."). Thus, an NME exporter may qualify for a company-specific

antidumping duty margin where it participates in the investigation, and: (1) requests a company-

---

[19]     This failure to cooperate with the investigation is distinct from the kind of failure to cooperate by not acting to the best of one's abilities found in 19 U.S.C. § 1677e(b). For the failure to cooperate to serve as the basis for assignment of the country-wide rate it must be of the sort found in *Sigma Corp. v. United States*, 117 F.3d 1401 (Fed. Cir. 1997), i.e., the failure to respond to Commerce's questionnaire. *Sigma*, 117 F.3d at 1411 ("Commerce stated that it was using the antidumping margin assigned to Guandong as the margin for all other Chinese exporters, *who did not respond to Commerce's questionnaire for that review*." (emphasis added)).

specific antidumping margin; and (2) provides evidence of its independence from government control in both law and fact.

Here, the Companies participated in the administrative review and had, by their questionnaire responses: (1) requested company-specific antidumping duty margins; and (2) submitted evidence of their independence from government control with their questionnaire responses. Based on these factors, Commerce preliminarily determined that the Companies had provided sufficient evidence of their independence from government control and preliminarily assigned them company-specific antidumping duty margins based on the sales and factors of production data submitted in their questionnaire responses. *See* Prelim. Results, 65 Fed. Reg. at 66,696. After verification, however, Commerce determined that, using facts available and adverse facts available, the Companies were not entitled to separate rates and, thus, assigned them the PRC-wide antidumping duty margin.

The Companies argue that Commerce's determination to reject their evidence of independence from government control was improper:

> Commerce's decision to subject Plaintiffs to the all-PRC dumping
> margin was wholly punitive and was made despite its having found
> in the Preliminary Results that Plaintiffs fully responded to the
> portions of the questionnaires regarding separate rates and
> demonstrated the continued entitlement to separate rates.
> Commerce fully verified these responses and found nothing to
> contradict them.

Pls.' Mem. at 4. The Companies further contend that they

provided all of the information that was necessary to establish their

> entitlement to separate rates. Commerce's claim that . . . the
> integrity of [their] reported data on the whole is compromised is
> belied by the fact that Commerce fully verified Plaintiffs' separate
> rates responses and . . . Commerce fully verified Plaintiffs'
> reported data.

*Id*. at 21.

The Government argues that Commerce's determination was proper. The Government

contends that

> [g]iven the nature and extent of the misrepresentations contained in
> the responses, Commerce could no longer rely upon Plaintiffs'
> responses to establish the nature of their relationship with the local
> and national governments. Significantly, some of the
> misrepresentations were in the separate rates responses themselves.
> Thus, Commerce lawfully determined that Plaintiffs had not
> adequately demonstrated entitlement to separate rates and should
> therefore be considered part of the PRC-wide entity.

Def.'s Opp'n Pls.' Mot. J. Agency R. ("Def.'s Resp.") at 14–15 (citations omitted).[20] In support,

the Government states that

> [e]ven though Huarong and LMC received separate rates in
> previous segments of these proceedings, it has long been
> Commerce's standard policy to conduct a separate rate inquiry
> each time an NME respondent is subject to review. In accordance
> with this policy, Huarong and LMC each submitted a facially
> adequate separate rates questionnaire response and Commerce
> preliminarily determined that these companies continued to be

---

[20]     The Government finds it significant that "some of the misrepresentations were in the separate rates responses themselves." Def.'s Resp. at 15. Although the Government never specifically identifies what these "misrepresentations" were, presumably they were the Companies' assertions in their questionnaire responses that they were in possession of certain documents, providing evidence of their independence from state control, that they were unable to produce at verification. As is discussed *infra*, however, Commerce did not request—either at verification or otherwise—that the Companies remedy this "deficiency" by providing such information.

> entitled to separate rates. *However, in the Final Results, Commerce denied Plaintiffs separate rates because the nature of their verification failures, including their lack of cooperation, cast doubt upon the reliability of their entire responses.*

*Id*. at 25 (citations and footnote omitted; emphasis added).

The Companies take issue with the Government's position:

> The separate rates issue is solely concerned with whether a company is independent in law and in fact from the government of China. Once a respondent establishes its independence from government control, it is entitled to have its margin calculated based on its reported sales and factors of production. . . .
>
> [T]here is no connection in this case between the Plaintiffs' independence from government control and the questions [[
>
>                                    ]].

Pls.' Reply at 15–16.

A.      *Facts available*

The court does not find proper Commerce's determination to reject the Companies' separate rates evidence and, thus, assign them the PRC-wide antidumping duty margin based on the presumption of state control. In support of its determination that the Companies would receive the PRC-wide antidumping duty margin based on facts available, Commerce stated that "due to the nature of [the Companies'] verification failures, and the inadequacy of [their] cooperation, the integrity of [the Companies'] reported data on the whole is compromised." *See* 66 Fed. Reg. at 48,028 (Huarong); *id*. (LMC) (same). This reasoning, however, cannot be the basis for assigning the Companies the PRC-wide antidumping duty margin based on facts

available, as it is clear the Companies did provide evidence of their entitlement to separate rates

and there is no indication that any necessary information was missing or incomplete. *See Nippon*

*Fed. Cir.*, 337 F.3d at 1381 ("The focus of subsection (a) is respondent's *failure to provide*

*information*." (emphasis in original)). In other words, the findings that justified the use of facts

available and a resort to adverse facts available with respect to the Companies' sales data and

factors of production, cannot be used to accord similar treatment to issues relating to the

Companies' evidence of independence from state control. Specifically, the record shows that the

Companies each submitted evidence of their entitlement to separate rates with their questionnaire

responses, and at verification Commerce found such evidence was not "compromised." In

addition, while the record shows that the Companies, by their questionnaire responses,

represented that they were in possession of all of the relevant documentation but at verification

were unable to produce all of the documents necessary to establish their entitlement to separate

rates, Commerce neither pressed them to produce such evidence nor otherwise requested that the

Companies rectify this "deficiency." *See* LMC Verification Report at 2; Huarong Verification

Report at 2. Furthermore, the record also shows that Commerce seemingly determined that the

lack of such documentation was not dispositive with respect to the separate rates determination.

*See* LMC Verification Report at 2–3 ("LMC officials confirmed that [the Ministry of Foreign

Trade and Economic Cooperation] allowed it to operate independent from the government.

However, when asked, LMC officials were unable to produce the document that allowed it to

operate independently. The Department notes, however, that this document has been cited in

previous periods of review for this case."); Huarong Verification Report at 2–3 ("Huarong

confirmed that the Ministry of Foreign Trade and Economic Cooperation (MOFTEC) allowed it

to operate independent from the government. However, when asked, Huarong was unable to produce the document that allowed it to do so. The Department notes, however, that this document has been cited in previous periods of review for this case."). Thus, because the Companies did provide evidence of their independence from government control and Commerce: (1) verified such information; (2) did not request the Companies to remedy any deficiencies in their separate rates information; and (3) did not find the lack of such information dispositive with respect to the separate rates determination, the court cannot sustain Commerce's determination that the Companies should be assigned the PRC-wide antidumping duty margin based on facts available.

B.      *Adverse facts available*

For the Final Determination, Commerce determined that the use of adverse facts available was warranted as to the Companies' separate rates information and, therefore, they would receive the PRC-wide antidumping duty margin. In support of its determination, Commerce reasoned that because the integrity of the Companies' data was "compromised," they "[had] not adequately demonstrated [their] entitlement to a rate separate from the PRC-wide entity." Decision Memo at 11 (LMC); *id*. at 6 (Huarong). The court cannot sustain Commerce's determination in this regard. Specifically, the Court of Appeals for the Federal Circuit has stated that, pursuant to 19 U.S.C. § 1677e(b), Commerce must make certain showings before it may resort to adverse facts available. *See Nippon Fed. Cir.*, 337 F.3d at 1382. Here, the record shows that the Companies apparently kept records sufficient to satisfy Commerce of their independence from state control and supplied such records to Commerce in a timely fashion. Because findings with respect to

data Commerce found to be "compromised"—i.e., the Companies' sales data and Huarong's factors of production data—are distinct from those related to state control, it is difficult to see how Commerce's determination with respect to the sales and factors of production data can form the basis for the use of adverse facts available with respect to independence from state control. Historically, Commerce has exercised its ability to parse respondents' questionnaire responses and apply adverse facts available only to a portion of a determination. *See Kao Hsing Chang Iron & Steel Corp. v. United States*, 26 CIT __, __, slip op. 02-142 (Dec. 6, 2002) (sustaining use of partial adverse facts available for "missing production quantity data for . . . [cost of production and constructed value] databases." (bracketing in original)); *Torrington Co. v. United States*, 25 CIT __, __, 146 F. Supp. 2d 845, 885 (2001) (remanding action where determination was based on partial adverse facts available as to the factor of production "packing expenses" and it was "unclear" what action Commerce took in arriving at that determination). Commerce has exercised this ability in the context of NME investigations. *See Pac. Giant, Inc. v. United States*, 26 CIT __, __, slip op. 02-140 at 4 (Dec. 2, 2002) (sustaining application of "partial adverse inference" to NME company's "labor" factor of production). Similar treatment would appear to be appropriate here. The Companies supplied the requested information and Commerce has not adequately demonstrated a sufficient reason to disregard the Companies' submissions of evidence of their entitlement to separate antidumping duty margins and resort to adverse facts available.

CONCLUSION

On remand, Commerce shall revisit, in a manner consistent with this opinion, its determination that the Companies were to receive the PRC-wide antidumping duty margin. Specifically, Commerce shall: (1) consider the separate rates evidence submitted by the Companies, (2) determine whether the assignment of separate rates for the Companies is warranted, i.e., that the Companies have demonstrated an absence of state control both in law and in fact, and (3) if Commerce finds that the assignment of separate rates is warranted, calculate separate antidumping duty margins for Huarong and LMC. In the event Commerce continues to find that the Companies should receive the PRC-wide antidumping duty margin, it shall make specific showings with explicit and complete references to the record with respect thereto. Such remand results are due within ninety days of the date of this opinion, comments are due thirty days thereafter, and replies to such comments eleven days from their filing.

_____
Richard K. Eaton

Dated: October 22, 2003
       New York, New York